Denise L. **NAPPIER**, et. al., Plaintiffs,

v.

**PRICEWATERHOUSE COOPERS LLP, Defendant.**

Civil Action No. 01–4717(JEI).

United States District Court, D. New Jersey.

Oct. 4, 2002.

See also: 145 F.Supp.2d 574.

---

264

Trujillo, Rodriguez & Richards, by Lisa J. Rodriguez, Haddonfield, NJ, for Plaintiffs.

Berger & Montague, P.C., by Sherrie R. Savett, Stuart J. Guber, Darin R. Morgan, Philadelphia, PA, for Plaintiffs.

Schatz & Nobel, P.C., by Andrew M. Schatz, Jeffrey S. Nobel, Patrick A. Klingman, Hartford, CT, for Plaintiffs.

Hughes Hubbard & Reed LLP, by William R. Maguire, John Fellas, New York, NY, for Defendant.

Drinker Biddle & Shanley LLP, by Vincent E. Gentile, Princeton, NJ, for Defendant.

## OPINION

IRENAS, District Judge.

In *In re Campbell Soup Company Securities Litigation,* No. Civ. A 00–152(JEI), this Court found that a class of plaintiffs consisting of certain current and former shareholders in the Campbell Soup Company (hereinafter "Campbell" or "the Company") had adequately stated a cause of action against Campbell, and a number of its directors and officers, for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). *See Campbell,* 145 F.Supp.2d 574 (D.N.J. 2001). The action presently before the Court is a related case against Pricewaterhouse Coopers LLP (hereinafter "Pricewaterhouse" or "PwC"), arising from that company's alleged participation in Campbell's alleged fraud. Specifically, the plaintiffs in this case, also a number of current and former Campbell shareholders, assert that Pricewaterhouse, which had been hired to conduct an audit of Campbell's financial statements for the 1998 fiscal year, violated the provisions of the Exchange Act, and its accompanying regulations, by knowingly or recklessly certifying that Campbell's fraudulent financials accurately reflected the health of the Company. However, as is discussed below, because the facts alleged against PwC do not support a "strong inference" that that firm acted with scienter in certifying Campbell's statements, Plaintiffs' action must be dismissed for failure to state a claim upon which relief may be granted.

### I.

By all accounts, the years leading up to 1997 were banner ones for the Campbell Soup Company, the world's largest manufacturer and marketer of soup products. As the Court noted in *Campbell,* in those years, "Campbell experienced great success, with increasing sales, gross margins, and profits, and a consequent increase in its stock price." *Campbell,* 145 F.Supp.2d at 580. However, according to the complaints filed in both *Campbell* and this litigation, those successes were the illusory result of a number of fraudulent "aggressive trade practices" and improper accounting procedures adopted by high-ranking officials within the Company. More specifically, the plaintiffs in these suits allege that Campbell, aided by the recklessness, if not active assistance, of PwC, engaged in a scheme to prematurely recognize revenue, thereby inflating the Company's margins and, consequently, stock price. Because these alleged practices are at the heart of this case, as well as the action against Campbell itself, it is appropriate that they be recited in some detail here.

According to the Plaintiffs, who comprise a putative class of all persons who purchased Campbell's common stock between October 9, 1998 and January 8, 1999 (other than certain high-level Campbell employees and related individuals), much of Campbell's successes during the class period were the result of its alleged practice of "trade loading". (*See* Compl. at ¶¶ 25–27). According to Plaintiffs, in order to satisfy the quarterly earnings projections of stock market analysts, Campbell maintained a practice of offering steep discounts (often as much as fifteen to twenty percent) to its customers at each

quarter's end, in order to increase sales. *Id.; see also, Campbell,* 145 F.Supp.2d at 580–81. While Plaintiffs concede that such "loading" is not itself fraudulent, they contend that the practice was accompanied by numerous accounting misstatements and improprieties. (Compl. at ¶ 37h).

According to Plaintiffs, Campbell traditionally offered its customers small price reductions (generally two to three percent), in return for the customer's participation in certain promotional activities involving Campbell products. (Compl. at ¶ 26). These discounts were then accounted for as "sales, general and administrative expenses" ("SG & A") rather than as deductions from gross revenue. This treatment, Plaintiffs state, was proper under generally accepted accounting principles ("GAAP"), which Campbell was obligated to follow. (Compl. at ¶ 26). However, Plaintiffs contend that Campbell treated the larger, loading discounts in the same manner, which was improper under GAAP and which resulted in artificially inflated statements of gross revenue. (*Id.* at ¶ 26, 37h (*citing* Accounting Principles Board Opinion No. 22)).

Despite these efforts, Plaintiffs contend, earnings expectations still could not be met. Accordingly, with most customers unable to accept more Campbell's product, management resorted to a number of further practices to continue sales. For instance, Plaintiffs allege, Campbell began conducting "bill-and-hold" transactions and "shipping to the yard", in which Campbell would "sell", but not ship, product to its customers, instead storing the product at off-site warehouses or loading it onto trucks parked at Campbell's facilities. (Compl.¶¶ 27–30). Treating these transactions as completed sales, as Campbell allegedly did, resulted, Plaintiffs contend, in the recognition of revenue well before it

was earned, in clear violation of GAAP. (Compl. at ¶ 37c).

A further illegitimate practice for overstating revenue, Plaintiffs allege, was Campbell's recognition of revenue from so-called "guaranteed" sales, that is, those in which a customer was provided a right of return. According to GAAP, Plaintiffs state, revenue from sales in which a customer retains a right of return may only be recognized where certain conditions are met, such as where the seller maintains an adequate reserve for returned product. (Compl. at ¶ 37d (*quoting* Financial Accounting Standards Board Statement No. 48)). Campbell, however, allegedly maintained no such reserve, despite the fact that product was being returned in such great quantities that the company's head of marketing, William Toler, instituted a policy requiring that all sales with a right of return be personally approved by him. (*See* Compl. at ¶ 31; Aff. of Stuart J. Guber, Ex. 2).

In October, 1998, Campbell submitted its fiscal 1998 Form 10–K to the Securities and Exchange Commission. Included in this filing was PwC's Audit Report of Campbell's financial statements, which provided an unqualified opinion that those statements

present fairly, in all material respects, the financial position of Campbell Soup Company and its subsidiaries at August 2, 1998 and August 3, 1997, and the results of their operations and their cash flows for each of the three years in the period ended August 2, 1998, in conformity with generally accepted accounting principles.

(Compl. at ¶ 38). On January 11, 1999, however, Campbell announced that its fiscal 1998 earnings would fall short of analysts' estimates by eighteen to twenty-three cents per share. (Compl. at ¶ 8). The reasons for this shortfall, Campbell

allegedly stated, were "inefficiencies in the supply chain" and "unseasonably warm weather". (*Id.*). Plaintiffs, however, assert that the real reasons for the failure were Campbell's loading and other aggressive sales practices. (*Id.*).

As noted, in *Campbell*, this Court held that the facts alleged above were sufficient to state claim for securities fraud against Campbell and its officers. In connection with their litigation against Campbell, Plaintiffs sought leave to take discovery to determine whether they might have a claim against Pricewaterhouse related to its audit of Campbell's finances. This Court granted Plaintiffs' request in June 2001 and, on October 4, 2001, Plaintiffs filed the instant action against PwC.

 As will be discussed in detail below, in order to maintain its independent claims against Pricewaterhouse, Plaintiffs must demonstrate that PwC knowingly or recklessly participated in Campbell's alleged fraud. In connection with their claims, therefore, Plaintiffs offer a number of additional allegations designed to demonstrate PwC's knowledge, or reckless disregard, of the practices and improprieties described above. In attempting to draw connections between Campbell's alleged fraud and PwC's audit, Plaintiffs rely on a number of documents allegedly created or reviewed by PwC in connection with its fiscal 1998 audit.[1]

In September, 1998, PwC's Bryan M. Reasons prepared a memorandum (the "Reasons Memo") addressing potential problems arising from Campbell's year-end revenue recognition policies. Specifically, the problem identified in the memorandum was related to Campbell's practice of treating all domestic sales as "FOB shipping point," meaning that revenue on such sales would be recognized as soon as the product left Campbell's shipping docks. (*See* Reasons Memo, attached as Ex. 4 to Aff. of William R. Maguire). However, the memo noted, some of the sales treated in this fashion were, in fact, "FOB destination", meaning that the risk of loss did not pass to the buyer until the product was received. This, the memo observed, created a risk that revenue from certain sales made at the end of one fiscal year, but not received by the buyer until the next, would be recognized prematurely. According to Plaintiffs, the Reasons memo "establishes that PwC had actual knowledge of Campbell's improper revenue recognition practice in connection with products 'shipped' to the 'yard' or to Campbell warehouses." (Pl. Br. at 16). In addition, Plaintiffs contend that the Reasons Memo, which makes reference to Campbell's "historical shipping practices, which generally involve heavy shipments at quarter ends," and to "incremental marketing spending" in connection with those shipments, establishes PwC's knowledge of the Company's improper loading practices. (Pl. Br. at 7–8).

In connection with their allegations regarding PwC's participation in Campbell's loading practices, Plaintiffs also point to a 1998 "Procedure Standard Report" which,

---

1. In deciding a motion to dismiss, a court's consideration is generally limited to the allegations contained in the complaint, exhibits attached thereto and matters of public record. *See* Fed.R.Civ.P. 12(b)(6); 2 James. Wm. Moore, et al., *Moore's Federal Practice,* § 12.34[2] (3d ed.2002). However, a court may also consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guaranty Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). In this case, Plaintiffs' allegations of scienter are explicitly based upon the contents of several PwC documents, each of which is referenced in Plaintiffs' Complaint. Accordingly, these documents are properly considered by the Court in deciding the instant motion.

in discussing a review of Campbell's promotional spending practices, made reference to "load dollars." (Ex. 5 to Maguire Aff.). This reference, Plaintiffs contend, permits an inference of "PwC's actual knowledge of the Company's practice of 'loading'—and its treatment of 'loading' discounts as SG & A rather than as a reduction of revenue." (Pl. Br. at 8).

Also relied upon in connection with their loading allegations is an August 26, 1998 PwC document entitled "Notes of Year End Audit Meeting." (*See* Ex. 6 to Maguire Aff.). In discussing the "level and timing" of Campbell's fourth quarter sales, this document refers to statements made by Campbell's employees regarding "additional trade spending to assist the late order pattern driven by Campbell's customer base." (*Id.*). According to Plaintiffs, in addition to establishing knowledge of Campbell's trade loading, because Campbell's quarter-end loading clearly was the result of the Company's calculated practices and not the demand of its customers, this statement raised, as will be discussed below, a "red flag" which should have given PwC reason to suspect Campbell's fraud and which is further evidence of PwC's complicity in Campbell's schemes.

The final document offered by Plaintiffs to establish PwC's knowledge of Campbell's loading practices is a "Work Paper" produced in connection with PwC's fiscal 1999 audit of Campbell's financial statements. (Ex. 7 to Maguire Aff.). In this document, PwC noted that during fiscal 1999, Campbell modified some of its "supply chain processes" and "historical shipping practices" to eliminate some of the heavy quarter-end shipments that were present in previous years. (*Id.*). This recognized modification, Plaintiffs contend, demonstrates PwC's knowledge of Campbell's earlier loading practices. (Pl. Br. at 10).

As noted above, Plaintiffs allege that an essential element of Campbell's fraud was the improper treatment of the heavy discounts offered in connection with its quarter-end sales as general marketing expenses rather than as a reduction in sales price. In attempting to connect PwC with these alleged accounting improprieties, Plaintiffs refer in their Complaint to a number of additional documents. (*See* Compl. at ¶ 44). First, Plaintiffs refer to two internal Campbell memoranda: a 1992 memo, from Campbell employee Garth Cooper, regarding "Accounting for World-wide Marketing Expenditures" (the "Cooper Memo", attached as Ex. 1 to Maguire Aff.) and a 1997 memo from Gerald S. Lord entitled "Modifications to Accounting Policies for Marketing/Advertising Costs" ("Lord Memo", Ex. 2 to Maguire Aff.). In these documents, Cooper and Lord explain that, under GAAP, discounts offered to customers should only be recorded as SG & A where some return "performance" is required of the customer. (*Id.*). According to Plaintiffs, the existence of these memoranda should be regarded as indicating to PwC that Campbell was experiencing serious problems with improper accounting in connection with its trade loading.

Finally, Plaintiffs' Complaint refers to a July 6, 1998 memo from PwC auditor Jennifer John, regarding "MIP Accrual", as further evidence of PwC's awareness of Campbell's improper accounting. Specifically, Plaintiffs contend that the "John Memo" (attached as Ex. 3 to Maguire Aff.), which states that Campbell's "promotional spending also includes incremental offerings ... offered to customers as additional incentive to purchase the company's products", demonstrates PwC's knowledge that Campbell was improperly

recording its loading discounts as SG & A expenses, rather than as reductions in gross revenue.

Additionally, Plaintiffs allege that PwC "knew of the existence of unusual numbers of trucks sitting in the 'yard'... which put PwC on notice of the need to audit more carefully the revenue recognized on shipments to the 'warehouse' or the 'yard'" and that "PwC knew or recklessly ignored that Campbell improperly ... recognized material amounts of revenue on 'guaranteed sales'" because information about such sales "was known or available to PwC through its access to Campbell documents." (Compl. at ¶¶ 45–46).

On May 30, 2002, Defendant filed the instant motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), contending 1) that Plaintiffs' claims are barred by the applicable statute of limitations; and 2) that Plaintiffs' allegations are insufficient to support the "strong inference of scienter" required by the Exchange Act, as amended by the Private Securities Litigation Reform Act of 1996.

## II.

### A.

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, the court will accept as true all of the factual allegations contained in the complaint and any reasonable inferences that can be drawn therefrom. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). Dismissal of claims under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). However, although the court must assume as true all facts alleged, "[i]t is not ... proper to assume that the [plaintiff] can prove any facts that [are] not alleged." *Associated General Contractors of Calif., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Finally, when "confronted with a [12(b)(6)] motion, the court must review the allegations of *fact* contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Commonwealth of Pennsylvania v. PepsiCo., Inc.*, 836 F.2d 173, 179 (3d Cir.1988) (emphasis added).

### B.

As noted above, Plaintiffs allege that Defendants' actions in conducting its 1998 audit violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5(b) (2001), both of which address "false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir.1997). Specifically, section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...." 15 U.S.C. § 78j(b). Rule 10b–5, in turn, makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b). Further, because section 10(b) and Rule 10b–5 apply to any statements that affect the transfer of securities, "liability ... may extend to secondary actors in the

securities markets, as for example where an outside accounting firm prepares a fraudulent audit report that it knows will reach and likely influence the investing public." *In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir.2002).

■■■ Accordingly, in order to state a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead that: (1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading[2]; (2) with scienter[3]; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff relied; and (5) the plaintiff's reliance was the proximate cause of its injury. *See EP Medsystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 871 (3d Cir.2000) (citing *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir.1997)); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 537 (3d Cir.1999) (citing *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 710 (3d Cir.1996)).

■■■ Because claims brought under section 10(b) and Rule 10b–5 are "fraud" claims, a plaintiff alleging such "false or misleading statements or omissions of material fact" must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." In addition, allegations of securities fraud also must satisfy the specific pleading requirements of the Private Securities Litigation Reform Act

of 1996 ("PSLRA"), 15 U.S.C. § 78u–4, *et seq.*

The PSLRA was designed to establish a "uniform and stringent pleading" standard and to provide added protection against what was perceived as a growing number of frivolous "strike suits" aimed at achieving quick settlements. *See* S.Rep. No. 104–98, at 15 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694; *Advanta,* 180 F.3d at 531; *see also, In re CDNOW, Inc. Securities Litig.,* 138 F.Supp.2d 624, 639 (E.D.Pa.2001) ("While the PSLRA does not resolve the tension between deterring securities fraud and stymieing meritless suits, it was designed to favor the second consideration."). Under the PSLRA, a complaint alleging violations of Section 10(b) and Rule 10b–5 must: "(1) specify each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading and, (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." *Klein v. Gen. Nutrition Cos.,* 186 F.3d 338, 344 (3d Cir.1999) (citing 15 U.S.C. § 78u–4(b)(1)).

■■■ In addition, under the Reform Act, the complaint must "state *with particularity* facts giving rise to a *strong* inference that the defendant acted with" scienter. *See* 15 U.S.C. § 78u–4(b)(2) (emphasis added). As the Third Circuit has noted, in Rule 10b–5 actions, this requirement supersedes the provisions of Rule 9(b) to the extent that rule would otherwise permit state of mind to be

---

**2.** To be actionable, a misrepresentation or omission must be material. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Material information is defined as "information that would be important to a reasonable investor in making his or her investment decisions." *In re*

*Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1425 (3d Cir.1997).

**3.** Scienter is defined generally as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

averred generally. *See Advanta*, 180 F.3d at 531 n. 5.[4] If a complaint fails to comply with the specific pleading requirements of the PSLRA, dismissal of the complaint is mandated. *See* 15 U.S.C. § 78u–4(b)(3)(A).

### III.

### A.

■ As noted, Defendant's first argument in support of its motion to dismiss is that Plaintiffs' claims are barred by the one-year statute of limitations applicable to claims under the 1934 Exchange Act. *See Campbell*, 145 F.Supp.2d at 600 ("Claims brought under § 10(b) or Rule 10b–5 must be filed 'within one year after the discovery of the facts constituting the violation and within three years after such violation.'") (*quoting Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)). In arguing that Plaintiffs' claims are time-barred, Defendant states that "except for the allegations about PwC's working papers, plaintiffs knew all the facts that they plead in the Complaint when they filed the *Campbell* amended complaint in June 2000. Since the PwC working papers add nothing to plaintiffs' claims, plaintiffs cannot rely on their 'discovery' of these innocuous 'new facts' to push the commencement of the statute of limitations beyond the date they filed the *Campbell* amended complaint." (Def. Br. at 28). The Court disagrees.

■ As this Court noted in *Campbell*, the inquiry into the running of the limitations period on a securities fraud claim involves two steps. First, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." *Campbell*, at 601 (*quoting Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir.2000)). Second, since "the statute of limitations does *not* necessarily begin running upon the emergence of facts exciting inquiry into the specific possibility of fraud," the court must then determine when any inquiry ultimately undertaken yielded sufficient concrete information to start the limitations period running. *Id.* (citations omitted).

The Court notes initially that the Defendant has provided no more than conclusory allegations that the Plaintiffs should have known of their claims against it at some point early on in the *Campbell* litigation. Generally, such allegations are insufficient to satisfy the fact-intensive inquiry regarding the timing of a plaintiff's knowledge of his or her claim. *See Campbell*, at 602 (noting that "it is inappropriate to dismiss claims where, as here, the analysis is so fact-intensive"). Further, Defendant's argument on the issue of the statute of limitations assumes an answer to the question that is at the heart of the instant motion. As noted, Defendant contends that because the documentary evidence produced by PwC is of little probative value, Plaintiffs' claim must be based upon the same facts as were at issue in *Campbell*. Thus, Defendant's argument goes, the limitations period in this case is identical to that in *Campbell*. However, the very issue in this case is whether the documentary evidence specifically implicating PwC is sufficient to state a claim upon which relief may be granted. Indeed, Plaintiffs themselves appear to concede that the general allegations against Campbell are insufficient to state a claim against PwC. (*See* Pl. Mem. at 38). To the extent that Plaintiffs have

---

4. While Fed.R.Civ.P. 9(b) requires that allegations of fraud or mistake be plead "with particularity," the rule ordinarily allows "malice, intent, knowledge, and other condition of mind of a person" to be "averred generally."

stated a claim against PwC, therefore, that claim is based primarily upon the evidence specifically implicating. PwC, evidence which appears unquestionably to have been discovered within one year of the filing of the instant action. Accordingly, whether Plaintiffs' claims will survive the instant motion depends not on when the circumstances giving rise to those claim were discovered, but whether those circumstances, when considered in their totality, rise to the level of an actionable claim.

## B.

■ Defendant's primary argument in support of its motion to dismiss is that Plaintiffs have failed to plead facts sufficient to support a strong inference of scienter, as required by the PSLRA. In the Third Circuit, a plaintiff may establish the requisite inference of fraudulent intent by alleging either: 1) "facts establishing a motive and an opportunity to commit fraud"; or 2) "facts that constitute circumstantial evidence of either recklessness or conscious behavior." · *Advanta,* 180 F.3d at 534–35; *see also, Wilson v. Bernstock,* 195 F.Supp.2d 619, 633 (D.N.J.2002). In this case, despite a few vague and conclusory allegations that PwC had an interest in ignoring Campbell's fraud in order to maintain its auditing and consulting relationship with the Company, Plaintiffs do not appear to contend that the facts alleged support a finding of motive and opportunity. Instead, Plaintiffs argue that the facts alleged are sufficient to constitute circumstantial evidence of recklessness, if not intent, on the part of PwC. *Cf. Advanta,* 180 F.3d at 535 ("As for recklessness, we reiterate our previous holding that it remains a sufficient basis for liability.")

(*citing Burlington Coat Factory,* 114 F.3d at 1418).

■ "To establish securities fraud, plaintiffs must establish ... at a minimum, 'highly unreasonable conduct involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *In re Ikon,* 277 F.3d at 667 (*quoting SEC v. Infinity Group Co.,* 212 F.3d 180, 192 (3d Cir. 2000)); *Advanta,* 180 F.3d at 535. In the context of alleged misstatements by an auditor, because liability is, in most cases, based upon the fraud of others, "the failure ... to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000).[5] Instead, the auditor's conduct must be "highly unreasonable, representing an extreme departure from the standards of ordinary care [and] must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Rothman,* 220 F.3d at 98.

· ■ According to Plaintiffs, Campbell's fraudulent scheme was premised upon the premature recognition of revenue, in contravention of GAAP. Indeed, Plaintiffs, in both their Complaint and briefs, cite a number of statements from authorities within the accounting profession to support their contentions. As the Court recognized in *Campbell,* since " 'generally accepted accounting principles' are not a

---

**5.** As this Court noted in *Wilson,* the standards applicable to securities law claims in the Third Circuit are "approximately equal in stringency to [those] of the Second Circuit"

and it is proper, therefore, to draw on the law of both circuits in determining the sufficiency of the Plaintiffs' claims. 195 F.Supp.2d at 633 (*quoting Advanta,* at 534).

'canonical set of rules' that dictate uniform treatment'", but are instead merely "broad statements of accounting principles amounting to aspirational norms as well as more specific guidelines and illustrations," 145 F.Supp.2d at 592 (*quoting Burlington Coat Factory* at 1421 n. 10), the determination of "what accounting practices comprise GAAP is a question of fact best addressed through expert testimony and thus inappropriate for resolution on a motion to dismiss." *Id.* Accordingly, in deciding the instant motion, the Court will assume that Campbell's accounting for its trade practices was improper.

■■■■ However, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim ... only where such allegations are coupled with evidence of corresponding fraudulent intent, might they suffice." *Novak*, 216 F.3d at 309 (citations omitted); *see also, In re Worlds of Wonder Securities Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994) ("The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."). In this case, as in most against a company's independent auditor, the details of the alleged fraud were not revealed on the face of the company's financial statements. Instead, Campbell's scheme required knowledge of the daily and historical operations of the company and its business relationships with its customers. Accordingly, in order to plead sufficient facts to support a strong inference of scienter on the part of PwC, Plaintiffs must plead specific facts that support the conclusion that PwC was aware of the sales and shipping practices employed at Campbell during the class period. *Accord Reiger v. Price Waterhouse Coopers*, 117 F.Supp.2d 1003, 1009 (S.D.Cal.2000) ("Where a transaction derives its suspiciousness from specific details associated with the audited company's business, the plaintiff must plead facts suggesting the accountant's awareness of those details.").

As mentioned, Plaintiffs cite a number of PwC documents as supporting an inference that PwC had actual knowledge of Campbell's aggressive trade practices and the attendant accounting improprieties. As also noted, because these documents are integral to Plaintiffs' claims, they may be considered by the Court in deciding Defendant's motion to dismiss.

■■■■ The PwC documents identified by Plaintiffs are offered, for the most part, to establish PwC's knowledge of Campbell's trade loading and the improper accounting treatment it received. With regard to their allegations of Campbell's guaranteed sales and bill-and-hold practices, Plaintiffs' contentions regarding PwC's knowledge of those practices is based almost entirely on what PwC "must have known" by virtue of its role as Campbell's auditor. (*See* Pl. Br. at 33 ("Particularly in light of PwC's extremely close working relationship with Campbell, including its long history as Campbell's auditor and its role as consultant to Campbell, there is at the very least a strong inference that PwC was aware of and reviewed (or recklessly ignored) credit memoranda and return authorizations and similar basic documents that revealed ... the guaranteed sales...."); Pl. Br. at 15 n. 5 ("The Complaint thus infers that PwC, as part of its inquiry into Campbell's inventory levels and shipping practices, would have discovered this large fleet of trucks parked on Campbell's lots at the end of each quarter.")). However, PwC's role as Campbell's auditor is insufficient, by itself, to permit an inference that PwC knew of these allegedly deceptive practices. *See Rothman*, 220 F.3d at 98 (Defendant's role as company's auditor for several years did not support inference of

knowledge of sales practices); *In re SCB Computer Technology, Inc. Securities Litig.*, 149 F.Supp.2d 334 (W.D.Tenn.2001) (Accountants' access to "contracts and documents that allegedly revealed improper revenue recognition" insufficient to permit strong inference of scienter); *Reiger*, 117 F.Supp.2d at 1011 ("The Court finds Plaintiffs' argument—that because Price Waterhouse had access to Altris' contract files, it must have known of the GAAP violations— wholly without merit.") *see also, Advanta*, 180 F.3d at 539 (Allegation that defendant, because of his position within defendant company, "must have known" of falsity of public statement insufficient to state a claim).

 With regard to the alleged practice of "shipping to the yard", Plaintiffs' general allegations that, in conducting its inventory inspection, it must have seen large numbers of trucks filled with sold-but-unshipped soup, are simply insufficient to establish anything more than the possibility that PwC was negligent in conducting its audit. Under the PSLRA, facts supporting an inference of scienter must be stated with particularity. Here, Plaintiff's allegations do not meet this standard.[6] While Plaintiffs attempt to buttress their argument by pointing to the Reasons Memorandum as evidence of PwC's "actual knowledge" of Campbell's sham sales, the Memo does not reasonably support such an inference. Simply put, the Reasons Memo, which deals with the premature recognition of revenue on certain shipments during the last three days of the year, has no probative value whatsoever with regard to allegations of improper revenue recognition involving transactions in which the product was never shipped at all. Indeed, if anything, the Memo supports the conclusion that PwB's audit was conducted in accordance with the standards of care required. According to the Reasons Memo, Campbell's traditional shipping practices "for the first time in 1998 identified a potential cut-off issue material enough to record on net effects." (Reasons Memo at PWC 00043). In response to this possible "red flag", PwC "revisited the Company's sales terms to confirm there were no other revenue recognition exposures other than the historical FOB shipping/destination disparity" (*id.*) and concluded that Campbell's policies were satisfactory. Plaintiffs offer no facts to suggest that this additional inquiry revealed any evidence from which PwC should have concluded otherwise.

[22, 23] A similar conclusion is reached with regard to Plaintiffs' allegations of guaranteed sales. In addition to Plaintiffs' conclusory allegation that PwC must have known of the guaranteed sales by virtue of its access to Campbell's files, Plaintiffs also point to the 1998 change in Campbell's sales policy, which required that all sales with a right of return be approved by William Toler, as a "red flag", which should have triggered an investigation into the Company's improper accounting. (*See* Pl. Br. at n. 6, n. 17). Again, the Court disagrees. First, while Plaintiffs' allegations are specific, their contention that

---

**6.** Plaintiffs also allege that recklessness may inferred because PwC did not conduct its audit in accordance with the procedures mandated by generally accepted accounting standards ("GAAS"). However, Plaintiffs' allegations in this regard are completely devoid of the particularity required under the PSLRA. While, as this Court has recognized, "the normally rigorous particularity rule has been re-laxed somewhat where the factual information is particularly within the defendant's knowledge or control,' " *Campbell*, at 584 (*quoting Burlington Coat Factory*, 114 F.3d at 1418), in this case Plaintiffs were permitted to conduct discovery into PwC's audit before filing their Complaint. Accordingly, the PSLRA's particularity standard fully applies to each of Plaintiffs' allegations.

PwC knew of Campbell's change in return policy is again based on PwC's general access to Campbell documents. Second, so-called "red flags", which should be deemed to have put a defendant on notice of alleged improprieties, *see In re Comshare, Inc. Securities Litig.*, 183 F.3d 542 (6th Cir.1999), must be "closer to 'smoking guns' than mere warning signs." *In re SCB*, 149 F.Supp.2d at 363. Campbell's statement of its return policy, a document which was not found in PwC's files, does not detail any reason for requiring preapproval of rights-of-return and therefore cannot be considered indicative of any recklessness on the part of PwC. (*See* Ex. 2 to Aff. of Stuart J. Guber).

■ In addition to the conclusory allegations noted above, Plaintiffs argue that the simplicity of the accounting principles at issue, and the magnitude of the alleged improprieties, should support a finding that scienter has been sufficiently alleged. To support this conclusion, Plaintiffs rely heavily on the decision in *In re MicroStrategy, Inc. Securities Litig.*, 115 F.Supp.2d 620 (E.D.Va.2000). In *MicroStrategy*, the court, in finding that the plaintiffs had sufficiently pled claims against a company and its auditor, stated that "the inference invited by the large magnitude of the misstated financials and the repetitiveness of the GAAP violations takes on added significance if, as the Complaint alleges, the violated GAAP rules and the Company accounting policies are, in fact, relatively simple." *Id.* at 638. Following this statement, Plaintiffs contend that "the elementary nature of the accounting rules at issue—which 'boil[ ] down to the well-worn adage, don't count your chickens before they hatch'—'are relevant and contribute probative weight to the inference of scienter' on the part of PwC." (Pl. Br. at 4). While the Court agrees with the general principle stated by Plaintiffs, and that the

accounting principles at issue in this case are not overly complicated, it believes that Plaintiffs' argument misses the heart of the matter. Unlike in *MicroStrategy*, the critical issue in the instant motion is not whether PwC misapplied GAAP to Campbell's obvious business practices, which would be a question of fact, but rather whether Plaintiffs have offered sufficient support for their contention that PwC knew of those business practices at all. With regard to this analysis, *MicroStrategy* offers little support.

■ Accordingly, Plaintiffs' claims against PwC must stand or fall based upon whether the documentary evidence provided in this case is sufficient to create a strong inference of scienter based upon PwC's alleged knowledge of Campbell's improper accounting for trade loading. As is discussed below, the Court concludes that it does not.

■ As noted above, in deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must construe all inferences in favor of the Plaintiffs. However, as one court has noted, given that Plaintiffs' allegations must support a *strong* inference of scienter,

> a plaintiff must state facts that, if true, would compel or forcefully suggest that a given defendant acted with the required state of mind. A plaintiff need not disprove every conceivable rationale a defendant might put forward to explain why a particular statement was made. However, if the facts alleged do not exclude other plausible explanations that would undercut a plaintiff's circumstantial evidence of scienter, then that plaintiff's facts cannot be fairly said to raise a "strong inference" that the defendant acted with the required state of mind.

*In re SCB*, 149 F.Supp.2d at 345 (*quoting Bryant v. Avado Brands, Inc.*, 100

F.Supp.2d 1368, 1376 (M.D.Ga.2000)); *cf. Wilson,* 195 F.Supp.2d at 634 (A complaint cannot survive a motion to dismiss under the PSLRA unless the inferences that can be drawn from its allegations are "both reasonable, rational or plausible and strong."). As Plaintiffs concede, Campbell's alleged trade loading is not itself fraudulent. Accordingly, in order to establish a strong inference of scienter, Plaintiffs must allege that PwC knew of, or recklessly disregarded, both Campbell's practice of loading *and* its treatment of the discounts associated with that loading as SG & A expenses.[7]

In their Complaint, Plaintiffs refer to two internal Campbell's memoranda, the "Lord Memo" and the "Cooper Memo", as suggesting that PwC knew of the Company's improper accounting for non-performance based trade loading discounts. (*See* Pl. Br. at 12–14). However, these documents, one from 1992 and the other from 1997, far from suggesting that improper accounting was occurring during the class period, merely lay out Campbell's policy of distinguishing between performance based and non-performance based discounts. Pursuant to this policy, which properly reflects GAAP, only performance-based discounts should be expensed. While the Lord Memo does recognize "inconsistencies in the classification of certain performance allowances/cooperative advertising programs", contrary to Plaintiffs' suggestions, it does not support any conclusion regarding the occurrence, or PwC's knowledge, of practices, during the class period,

*contrary to* Campbell's expressed policy. Instead, the Lord Memo demonstrates that Campbell modified its policy to assure proper accounting for non-performance related discounts, thus abrogating, at least officially, the practice, referred to in the 1992 Cooper Memo, of accounting for all customer discounts as expenses. As has been recognized, "an independent accountant often depends on its client to provide the information base for the audit." *Reiger,* 117 F.Supp.2d at 1007. Accordingly, documents such as those offered by Plaintiffs, which suggest proper accounting practices during the time period at issue, do not constitute "red flags" merely because they intimate that improper practices may have been implemented during some earlier time period. Thus, the Court does not view the Lord and Cooper memos as suggestive of any fraudulent intent on the part of PwC.

The remaining documents to which Plaintiffs look for an inference of scienter were produced during the course of PwC's fiscal 1998 audit of the Campbell Soup Company. Not surprisingly, it is these documents that Plaintiffs contend provide the strongest evidence of PwC's knowledge during the class period.

The documents referenced by Plaintiffs arguably support the conclusion that PwC was generally aware of Campbell's practice of increasing sales of product at the end of each quarter. The memorandum prepared by PwC's Bryan Reasons notes that:

7. In *Campbell,* it was alleged that Campbell's failure to disclose its various trade practices was itself an actionable misstatement. *See Campbell* at 585. In this case, however, at least with regard to trade loading, Plaintiffs do not appear to contend that PwC may be liable solely based on Campbell's non-disclosure, apart from any accounting improprieties. In any event, there is no indication that PwC's awareness of Campbell's end-of-quar-

ter shipping practices were unusual in size or number. Indeed, PwC repeatedly referred to the end-of-quarter shipping as part of Campbell's "traditional" practices and where, as in the case of the FOB shipping/destination issue, such practices had a potential impact on Campbell's financials, an investigation into the propriety and materiality of such practices was conducted.

[r]ecent discussions with management have indicated some business concerns with the level of trade inventories, that is product held by distributors and retailers in the marketplace. These concerns have been derived from potential inefficiencies and the incremental costs in the supply chain process that arise from the Company's historical shipping practices, which generally involves heavy shipments at quarter ends (warehousing costs, production peaks and overtime spending, freight and incremental marketing spending).

(Maguire Aff., Ex. 4, at PWC 00043). Additionally, PwC'S August 26, 1998 "Notes of Year End Audit Meeting" makes reference to "additional trade spending to assist late order pattern" and the "level/timing of 4th quarter sales". (Maguire Aff., Ex. 6, at PWC 00172). However, as recognized by both parties, and as the Court has noted in this case and *Campbell*, offerings of discounts at quarter's end are not themselves fraudulent. *See also, Greebel*, 194 F.3d at 202–03 ("There is nothing inherently improper in pressing for sales to be made earlier than in the normal course . . . unlike altering documents, there may be any number of legitimate reasons for attempting to achieve sales earlier. Thus, it does not support a strong inference of scienter."). Further, there is no indication that PwC knew that the offerings during the class period were unusual in relation to Campbell's traditional practices or the demands of the Company's customers. To create a strong inference of scienter on the part of PwC, therefore, Plaintiffs must allege facts establishing a connection between PwC's knowledge of Campbell's fourth quarter discounts and the alleged improper accounting practices of the Company. This is where Plaintiffs' allegations fall short.

In the 1997 Lord Memo, Campbell advised members of its marketing depart-ment to distinguish between performance-based customer discounts and those that required no action on the part of the buyer. (Maguire Aff., Ex. 2). Accordingly, in order to demonstrate scienter on the part of PwC, Plaintiffs must identify facts suggesting that PwC was aware that Campbell had departed from its stated policy.

In a memorandum regarding Campbell's "MIP Accrual" (the "John Memo"), PwC discussed Campbell's accounting for "promotional spending" offered to customers. According to Plaintiffs, this document "clearly demonstrates that PwC was aware of Campbell's practice of accounting for extraordinary quarter-end discounts as part of 'promotional spending,' which were improperly 'expensed' to SG & A." (Pl. Br. at 11). While the memo does, indeed, refer to treatment of promotional spending as an expense, it does not offer any indication that the alleged loading discounts were considered as promotional spending. According to the John Memo, each year, Campbell allocates, as part of its budget, certain amounts to be spent on promotional spending during the year. (Maguire Aff., Ex. 3, at PWC 00143). The memo also notes that, in addition to these budgeted amounts, Campbell offers customers certain "incremental offerings" as an incentive to purchase Campbell's products. According to Plaintiffs, "incremental offerings" are loading discounts and the John Memo's recognition of the treatment of those discounts as promotional spending demonstrates PwC's knowledge of Campbell's GAAP violations. However, nowhere does the John Memo, or any other PwC document, suggest that incremental offerings are the same as loading discounts. While Plaintiffs are correct that the Court must draw all reasonable inferences in their favor, this general rule does not permit Plaintiffs to demonstrate a fraudulent intent simply by defining cer-

tain terms in a way that assumes the required state of mind. Without any suggestion that the John Memo addressed any spending other than that offered in return for customers' product promotions (which is what the term "promotional spending" would ordinarily be used to describe), Plaintiffs' allegations of scienter simply cannot be based on that document.[8]

The final document upon which Plaintiffs rely in their attempts to establish the requisite inference of scienter is the "Procedure Standard Report" generated by PwC during its 1998 audit. According to Plaintiffs, this document, which makes reference to "load dollars", provides evidence that PwC knew that Campbell was accounting for non-performance related discounts as ordinary promotional expenses. (Pl. Br. at 8–9). However, this reference, whatever it means, is insufficient to support the required strong inference of recklessness.

As Defendant points out, nowhere in the Procedure Standard Report is there any suggestion regarding the meaning of the term "load dollars". Further, while Plaintiffs allege that the term "loading" was commonly used at Campbell, they offer no suggestion whatsoever that the meaning of the term, as Plaintiffs use it, was understood by PwC. Indeed, there is not one additional use of the term anywhere in the documents identified in Plaintiffs' Complaint. While Plaintiffs contend that they are entitled to an inference that "load dollars means what it sounds like: discounts ("dollars") offered in exchange for "loading" customers up with additional product beyond their actual requirements," (Pl. Br. at 9), the meaning of the term on its face is not, by any means, clear and Plaintiffs'

conclusory allegations regarding its meaning are insufficient, by themselves, to create an inference that PwC understood it to take on that meaning.

In addition, the entry to which Plaintiffs refer addresses PwC's evaluation of Campbell's accounting for promotional ("MIP") spending in one single product line. Even assuming that "load dollars" was understood as Plaintiffs assert, its use in reference to one accounting entry is not powerful enough to create an inference that PwC was aware of the practice with regard to Campbell's operations as a whole. Further, all that the Procedure Standard Report indicates regarding "load dollars" is that those amounts were not offset against budgeted MIP expenses; the memo says nothing about how such amounts were accounted for. Accordingly, no strong inference of scienter can be supported by that document.

In conclusion, although Plaintiffs seek to establish PwC's awareness of Campbell's improper accounting and sales practices through numerous sources, consideration of these sources simply does support the strong inference of scienter required by the PSLRA. Under the PSLRA, Plaintiffs are required to go beyond the ordinary pleading standards established by the Federal Rules of Civil Procedure to offer allegations supporting a *strong* inference of scienter. Here, despite the opportunity for discovery and the production of numerous internal documents created by the Defendant, Plaintiffs have not done so. Thus, while Plaintiffs' allegations might provide some indication that PwC's 1998 audit was generally inadequate, they fall short of creating a strong inference of scienter.

---

8. In two places the John Memo refers to accruals for "spending offered but not yet spent by the company's customers." This clearly reflects PwC's understanding that the

MIP promotional expenses involved reciprocal performance by Campbell's customers and were thus properly expensed rather than treated as reducing gross sales.

Accordingly, Defendant's motion to dismiss will be granted.

However, as per their request, Plaintiffs will be granted an opportunity to move for leave to file an amended complaint. Under Fed.R.Civ.P. 15(a), leave to amend "shall be freely given when justice so requires." Here, Plaintiffs suggest that they may be able to offer additional facts and documentary evidence supporting their contention of recklessness on the part of PwC. While the Court is somewhat skeptical that, given their opportunity for discovery and their attorneys' extensive experience with the requirements of the PSLRA, Plaintiffs are, in fact, in possession of information not contained in their initial Complaint, "because [courts should be] hesitant to preclude the prosecution of a possibly meritorious claim because of defects in the pleadings," *Burlington Coat Factory,* at 1435 (citation omitted), Plaintiffs will be given sixty days to formally move to amend their complaint through the submission of a proposed amended complaint addressing the deficiencies described in this opinion.