334 F.Supp.2d 637 (2004)
In re SUPREMA SPECIALTIES, INC. SECURITIES LITIGATION
Special Situations Fund, III, L.P., et al., Plaintiffs
v.
Mark Cocciola, et al., Defendants.
Nos. CIV.A. 02-0168, CIV.A. 02-3099.
United States District Court, D. New Jersey.
August 26, 2004.
*638 *639 *640 *641 *642 Joseph J. Depalma, Lead Attorney, Lite, DePalma, Greenberg and Rivas, LLC, Newark, NJ, for Donald Smith, Plaintiff (2:02-cv-00168-WHW).
Lawrence M. Rolnick, Lawrence M. Rolnick, Lowestein Sandler, PC, Roseland, NJ, for Special Situations Fund, III, L.P., Plaintiff (2:02-cv-03099-WHW).
Lawrence M. Rolnick, Lead Attorney, Lowestein Sandler, PC, Roseland, NJ, for Special Situations Cayman Fund, L.P., Plaintiff (2:02-cv-03099-WHW).
Leo W. Desmond, Lead Attorney, Sparta, NJ, for Scott Walls, Consolidated Plaintiff (2:02-CV-00168-WHW).
Joseph J. Depalma, Lead Attorney, Lite, Depalma, Greenberg and Rivas, LCC, Newark, NJ, for Rena Nadoff, Gregory Harris, Consolidated Plaintiff (2:02-cv-00168-WHW).
*643 J. Erik Sandstedt, Lead Attorney, Bernstein Litowitz Berger & Grossman LLP, Westfield, NJ, for Teachers' Retirement System of Louisiana, Consolidated Plaintiff (2:02-cv-00168-WHW).
Diane J. O'Neill, Lead Attorney, Mendes & Mount, Esqs., Newark, NJ, for Mark Cocchiola, Marco Cocchiola, Defendants (2:02-cv-00168-WHW).
Pamela J. Labaj, Lead Attorney, Curtis, Mallet-Prevost, Colt & Mosle, LLP, New York City, for Stevens Venechanos, Defendant (2:02-cv-00168-WHW).
Theodore D. Moskowitz, Lead Attorney, McCarter & English, Newark, NJ, for Rudolph Acosta, Paul Desocia, Barry Rutcofsky, Defendants(2:02-cv-00168-WHW).
Cathy Fleming, Lead Attorney, Edwards & Angell, LLP, Short Hills, NJ, for BDO Seidman, LLP, Defendant (2:02-cv-00168-WHW).
Nancy E. Delaney, Lead Attorney, Curtis, Mallet-Prevost, Colt & Mosle, PC, New York City, for Steven Venechanos, Defendant (2:02-cv-03099-WHW).
Joseph E. Lubertazzi, Jr., Theodore D. Moskowitz, Lead Attorney, McCarter & English, Newark, NJ, for Rudolph Acosta, Paul Desocio, Barry Rutcofsky, Defendants (2:02-cv-03099-WHW).
Alfred J. Lechner, Jr., Lead Attorney, Morgan, Lewis & Bockius LLP, Princeton, NJ, for BDO Seidman LLP, Defendant (2:02-cv-03099-WHW).
Cathy Fleming, Lead Attorney, Edwards & Angell, New York City, for BDO Seidman LLP, Defendant (2:02-cv-03099-WHW).
Robert A. Assuncao, Lead Attorney, Piper Rudnick LLP, Edison, NJ, for Oberweis.net, Westminster Securities Corp., Defendants (2:02-cv-0399-WHW).
Anthony P. Larocco, Lead Attorney, Kirkpatrick & Lockhart LLP, Newark, NJ, for Paulson Investment Company, Inc., Defendant (2:02-cv-03099-WHW).
Frederick M. Klein, Lead Attorney, Nicoletti, Hornig, Campise & Sweeney, Esqs., Hackensack, NJ, for Westport Resources Investment Services, Inc., Defendant (2:02-cv-03099-WHW).
Michael J. Canavan, Lead Attorney, Pepper Hamilton, LLP, Princeton, NJ, for Roth Capital Partners, LLC, Janny Montgomery Scott, LLC, Pacific Growth Equities, Consolidated Defendant (2:02-cv-00168-WHW).

OPINION
WALLS, District Judge.
This matter is before the Court on Defendants' Motions to Dismiss the Complaint in two securities fraud cases that were consolidated before this Court as In re Suprema Specialties, Inc. Securities Litig. The first case, Civ. No. 02-168 (the "Class Action"), is a class action prosecuted by lead plaintiff Teachers' Retirement System of Louisiana (the "Lead Plaintiff"). The second, Civ. No. 02-3099, is prosecuted by plaintiffs Special Situations Fund III, L.P. and Special Situations Cayman Fund LLP (collectively, "SSF Plaintiffs" or "SSF").

FACTS
The factual and procedural history of this case are in this Court's Opinion of June 25, 2003 ("June 25, 2003 Opinion"). Since the issuance of that Opinion, Lead Plaintiff for the class and the SSF Plaintiffs filed motions for leave to amend the complaints. On January 8, 2004, the morning of the oral argument of the motions for leave to amend the complaints, Plaintiffs brought four criminal Informations to the Court's and the Defendants' attention. The criminal Informations were *644 submitted with the guilty pleas of JohnVan Sickell, a former Suprema employee, and Robert Quattrone, Lawrence Fransen, and George Vieira, former Suprema customers. These four men plead guilty to conspiracy to commit, inter alia, securities fraud, to make false statements to auditors and to introduce, or cause the introduction of, adulterated and misbranded food into interstate commerce. In light of this new information, the parties agreed to file the Second Amended Complaints ("Class Complaint" and "SSF Complaint," respectively) subject to renewed Motions to Dismiss which are presently before the Court.
Both Plaintiffs included new facts that purportedly satisfied the Rule 9(b) and PSLRA requirements and showed that Suprema's business was a sham. These new facts are based on Plaintiffs' extensive access to sources including, inter alia, Suprema's business records received by Lead Plaintiff from counsel to the Liquidation trustee; discussions with counsel to the Liquidation Trustee, discussions with representatives of the A & J receiver and a review of filings made in connection with the A & J receivership proceedings; interviews of customers and suppliers of Suprema; physical inspections and photographs of the `ship to' addresses indicated on Suprema's hard cheese invoices; and the criminal Informations submitted with the guilty pleas of Van Sickell, Quattrone, Fransen, and Vieira. The criminal Informations set forth specific details about what, where, when, and how the fraud took place. The "who" was merely identified as "Suprema's management" or "Suprema's senior management." (See, e.g., Class Complaint ("CC") ¶¶ 175-245, SSF Complaint ("SSF") ¶¶ 59, 94, 95.)

THE PARTIES
A. Lead Plaintiff (in the Class Action). Lead Plaintiff, Teachers' Retirement System of Louisiana, is a public pension fund organized for the benefit of the current and retired public school teachers of the State of Louisiana. It is located in Baton Rouge, Louisiana, and has total assets of approximately $10 billion. Lead Plaintiff represents a class of investors who purchased shares of Suprema stock pursuant to the company's Secondary Offering. Lead Plaintiff purchased 47,200 shares.
B. SSF Plaintiffs (in the SSF Litigation). The SSF Plaintiffs are investment partnerships that purchased almost 400,000 shares of Suprema stock at various times between August 25, 2000 and November 14, 2001. Certain of these shares were purchased in conjunction with the company's Secondary Offering and 2000 Offering.
C. Suprema (unnamed defendant in both cases). As noted, Suprema was a manufacturer, processor and marketer of gourmet Italian cheeses with principal place of business in Paterson, New Jersey. Other company facilities were located in New York, California and Idaho. Suprema is not named as a defendant. Pursuant to its bankruptcy filing, it is subject to the protection of a bankruptcy stay.
D. The Inside Individual Defendants.
1. Mark Cocchiola (defendant in both cases). Defendant Mark Cocchiola ("Cocchiola") is the co-founder of Suprema and, at all times relevant to these actions, was the company's CEO and Chairman of the Board of Directors (the "Board"). As of June 30, 2001, Cocchiola was the largest shareholder of the company, owning or controlling 1.1 million shares or 17.4% of the company's common stock issued and outstanding.
2. Steven Venechanos (defendant in both cases). Until his resignation on December 21, 2001, Venechanos was Suprema's CFO, Secretary and member of the Board. As of June 30, 2001, *645 Venechanos owned or controlled over 138,000 shares of Suprema stock, approximately 2.4% of shares issued and outstanding. Pursuant to the Secondary Offering, Venechanos sold approximately 53,000 shares, realizing profits of almost $628,000.
E. Outside Director Defendants (defendants in both cases). Defendants Rudolf Acosta, Jr. ("Acosta"), Marco Cocchiola, Paul DeSocio ("DeSocio"), and Barry Rutcofsky ("Rutcofsky") were each members of Suprema's Board who signed the registration statement and prospectus of the Secondary Offering.
F. The Underwriter Defendants (defendants in both cases). Defendants Janney Montgomery Scott LLP, Roth Capital Partners LLC, and Pacific Growth Equities (collectively the "Underwriter Defendants") are investment banking firms who underwrote the Secondary Offering.
G. BDO Seidman LLP (defendant in both cases) ("BDO"). Defendant BDO is a Chicago-based accounting firm which provided auditing services to Suprema at all times relevant to these cases.
H. The 2000 Underwriter Defendants (defendants in the SSF Litigation only). The SSF Plaintiffs also assert claims against investment banks who underwrote Suprema's 2000 Offering. They are Paulson Investment Company, Inc., Westport Resources Investment Services, Inc., Westminster Securities Corp., and Oberweis.net, or collectively, the "2000 Underwriter Defendants."

THE CLAIMS
The Class Complaint alleges the following claims:
Count 1: Against all defendants for violations of Section 11 of the Securities Act
Count 2: Violations of Section 12(a)(2) of the Securities Act Against Cocchiola, Venechanos and the Underwriter Defendants
Count 3: Violations of Section 15 of the Securities Act Against Cocchiola and Venechanos
Count 4: Against Cocchiola, Venechanos for Violations of Section 10(b) of the Exchange Act
Count 5: Against BDO for Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Count 6: Against Cocchiola and Venechanos for Violations of Section 20 of Exchange Act
The SSF Complaint alleges the following claims:
Count 1: Violations of Section 11 of Securities Act against all defendants
Count 2: Violations of Section 12(a)(2) of the Securities Act against Cocchiola, Venechanos and one of the 2000 Underwriter Defendants
Count 3: Violations of Section 15 of the Securities Act against Cocchiola, Venechanos and the Outside Director Defendants
Count 4: Violations of Section 18 of the Exchange Act against Cocchiola, Venechanos, the Outside Director Defendants, and BDO
Count 5: Against Cocchiola, Venechanos, the Outside Director Defendants and the Underwriter Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
Count 6: Against BDO for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
Count 7: Violations of Section 20 of the Exchange Act against Cocchiola, Venechanos and the Outside Director Defendants
*646 Count 8: Common Law Fraud/ Fraudulent Misrepresentation against all defendants
Count 9: Negligent Misrepresentation against all defendants

STANDARD OF REVIEW
On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir.1994). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).
While a court will accept well-plead allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. See Miree v. DeKalb County, Ga., 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. See Fed.R.Civ.P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. See Pittsburgh v. West Penn Power Co., 147 F.3d 256, 259 (3d Cir.1998); see also 5A Wright & Miller, Federal Practice & Procedure § 1357 at 299 (2d ed.1990).
"A `document integral to or explicitly relied on in the complaint' may be considered `without converting the motion [to dismiss] into one for summary judgment.'" In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997) (citation omitted). "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." Id.

DISCUSSION
I. Material Misrepresentations Common to §§ 11, 12, 18, and 10(b) Claims
As stated in this Court's Opinion of June 25, 2003, "a common requirement of all of plaintiffs' claims is an allegation of a material misstatement or omission. Sections 11 and 12 of the Securities Act and sections 10(b) and 18 of the Exchange Act all require an allegation of a material misstatement." In re Westinghouse Sec. Litig., 90 F.3d 696, 707 (3d Cir.1996) (citation omitted). The control person claims under section 15 of the Securities Act and section 20 of the Exchange Act each require an underlying violation of the respective statute, and thereby incorporate the requirement. To be actionable, a statement or omission must be misleading at the time it was made; liability cannot be imposed on the basis of later events. In re MobileMedia Sec. Litig., 28 F.Supp.2d 901, 925 (D.N.J.1998) (citing Zucker v. Quasha, 891 F.Supp. 1010, 1014-17 (D.N.J.1995), aff'd 82 F.3d 408 (3d Cir.1996)) (filing for bankruptcy four months after offering could not be used to support claim that corporation was in a precarious financial position at time of offering). "At a minimum, each of the securities fraud provisions" allegedly violated by the Defendants "requires proof that the defendants made untrue or misleading statements or omissions of material *647 fact." In Re Donald J. Trump Casino Securities Litigation, 7 F.3d 357, 368 (3d Cir.1993); Zucker v. Quasha, 891 F.Supp. 1010, 1014 (D.N.J.1995). Allegations that a company's later financial difficulties imply that earlier financial statements were untrue or misleading are "fraud by hindsight" and do not state a claim. In re MobileMedia, 28 F.Supp.2d at 925 (citation omitted).
The misrepresentations alleged by Plaintiffs can be summarized as follows:
1) the statements in the 2001 Annual Report and other SEC filings regarding hard cheese sales, compliance with loan covenants, and accounts receivable, which plaintiffs claim were inflated because the hard cheese business, in reality, was a sham, based on round trip sales and fictitious transactions;
2) Suprema's fundamental misstatements of the nature of its business because it was "brokering" or "invoicing" business instead of a manufacturer; the cheese was not "all natural" but "adulterated and not fit for human consumption";
3) the failure of the 2001 Annual Report to declare that several of Suprema's largest customers were "interrelated"; and
4) the representations that Suprema's financial statements were prepared in accordance with GAAS and GAAP.
The guilty pleas and criminal Informations of Van Sickell, Quattrone, Vieira and Fransen confirm that there were in fact misstatements in the 2000 and 2001 Registration Statements and Prospectuses and the financial statements audited by BDO. (See SSF ¶¶ 190-220; CC ¶¶ 83-147.)
II. Securities Act
Section 11
Section 11 establishes a private right of action for any person who acquires a security, the registration statement for which contained a material misrepresentation or omission. If the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading," then "any person acquiring such security" may sue a number of enumerated individuals and entities. 15 U.S.C. § 77k(a).
Those subject to liability under § 11 are:
(1) every person who signed the registration statement;
(2) every person who was a director of (or person performing similar function) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him; and
(5) every underwriter with respect to such security.
15 U.S.C. § 77k(a)(1-5). Section 11 generally does not require a showing of intent or scienter. In re Cendant Corp. Litig., 60 F.Supp.2d 354, 363 (D.N.J.1999). If a *648 plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Id. (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).
Where a plaintiff seeks to hold § 11 defendants liable for a negligent misrepresentation or omission, his or her claim is not subject to the pleading requirements of Fed.R.Civ.P. 9(b). Id. (citing Shapiro v. UJB Financial Corp., 964 F.2d 272, 288 (3d Cir.1992)). However, where a § 11 claim is based on allegations of fraud, the heightened pleading requirements of Rule 9(b) apply. Id. Rule 9(b) requires that a plaintiff plead: (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his or her damage. Castlerock Mngmt., Ltd. v. Ultralife Batteries, Inc., et al., 68 F.Supp.2d 480, 485 (D.N.J.1999) (citing Shapiro, 964 F.2d at 284). Because in the securities context the "factual information is peculiarly within the defendant's knowledge or control," the Third Circuit has stated that "the normally rigorous particularity rule has been relaxed somewhat.... But even under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." Castelrock Mngmnt., 68 F.Supp.2d at 485 (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir.1997)). Plaintiffs must identify with specificity "who, what, when, where and how." In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir.1999).
Section 12
Under § 12(a)(2) any defendant who "offers or sells a security... by means of a prospectus or oral communication" containing a materially false statement or "omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made public, not misleading," shall be liable to any "person purchasing such security from him." Castlerock Mngmnt., 68 F.Supp.2d at 484-85 (quoting 15 U.S.C. § 77l (a)(2)). To state a claim under § 12(a)(2), a complaint must allege that (1) defendant sold or offered the sale or securities; (2) by the use of any means of communication in interstate commerce; (3) through a prospectus or oral communication; (4) by making a false or misleading statement of a material fact or by omitting to state a material fact necessary to make the statements not misleading; (5) plaintiff did not know of the untruth or omission; and (6) defendants knew, or in the exercise of reasonable care, could have known of the untruth or the omission. In re MobileMedia Sec. Litig., 28 F.Supp.2d at 924 (citing Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 687-88 (3d Cir.1991)). As is the case under § 11, claims brought under § 12 need be plead with particularity in compliance with Rule 9(b) only if they sound in fraud. Id.
Section 11 and 12(a) Standing
At the pleading stage, the court may "presume that the general allegations in the complaint [as to standing] encompass the specific facts necessary to support those allegations.... Alternatively, however, it is "proper," and "`within the trial court's power,'" even on a motion to dismiss, `to require the [plaintiff] to go beyond ... general allegations in the complaint and allege particularized facts *649 supportive of its standing.'" Clark v. McDonald's Corp., 213 F.R.D. 198, 206 (D.N.J.2003) (citations omitted). With respect to plaintiffs' claims under § 12(2), the issue is clear-cut: unless a plaintiff has purchased his shares in the Initial Public Offering, he cannot assert a claim. Gustafson v. Alloyd Co., 513 U.S. 561, 566, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); Warden v. Crown American Realty Trust, 1998 WL 725946 (W.D.Pa.1998) (unpublished), aff'd 229 F.3d 1140 (3d Cir.2000).
"To state a claim under Section 11, a plaintiff must allege: 1) The plaintiffs purchased securities traceable to an effective registration statement; 2) The defendants fall within the statutorily enumerated categories; and 3) the registration statement, at the time it became effective, contained a material misstatement or omission." In re MobileMedia Secs. Litig., 28 F.Supp.2d at 923 (D.N.J.1998). The parties debate the acceptance of using tracing to determine standing. The cases relied on by Defendants misinterpret Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682 (3d Cir.1991). The Ballay court decided that purchasers of shares in the secondary market can not bring a cause of action under section 12 of the Securities Act. No section 11 claim was alleged in Ballay. Plaintiffs rely on In re Adams Golf, Sec. Litig., 176 F.Supp.2d 216, 226-227 (D.Del.2001) which discusses the state of the law on tracing and concludes "this court will adopt the view that aftermarket purchasers may proceed under § 11 so long as they can trace the purchase of their shares to a public offering that is covered by the offending registration statement." See Shapiro v. UJB Fin. Corp., 964 F.2d 272 (3d Cir.1992) ("We agree that traceability must be alleged..."); Copland v. Grumet, No. Civ. A 96-3351, 1998 WL 256654, at *4 (D.N.J. Jan. 9, 1998). But see Warden v. Crown American Realty Trust, 1998 WL 725946 at *3 (W.D.Pa. October 15, 1998), aff'd 229 F.3d 1140 (3d Cir.2000) (holding that the Ballay and Shapiro decisions are clear that the Securities Act exists to protect investors in initial offerings, not those who purchase on the secondary market).
Defendants argue that Plaintiffs do not have standing because they cannot show that securities were purchased "in or traceable to" the 2000 or 2001 Secondary offerings or both. Plaintiffs contend that they have standing to bring their Section 11 and 12(a)(2) claims because the Class Complaint alleges in ¶ 8 that they purchased "in" the 2001 secondary offering and in ¶ 11 of the SSF Complaint, plaintiffs allege that they purchased shares "in" the 2000 secondary offering and shares "traceable to" the 2001 secondary offering. Because Plaintiffs have alleged that they have purchased "in" or "traceable to" the 2000 and 2001 secondary offerings, Plaintiffs have plead standing sufficiently at this motion to dismiss stage.
A. Section 11
Class Complaint
Although Lead Plaintiff states in ¶ 45 that "This claim is not based on and does not sound in fraud," a review of the allegations in Count 1 asserting the section 11 claim shows that the allegations of that claim alone "sound in fraud." As example, the Class Complaint states that this case arises from a "massive fraud" that resulted in "materially false and misleading" Registration Statements under the Securities Act (¶¶ 1, 2), four "individuals admitted that certain of Suprema's public statements relating to its financial results and the nature of its business were untrue" (¶ 83) because they were based on "transactions that never actually took place" (¶ 87). Also, Suprema's total aggregate sales for fiscal years 1999, 2000, *650 2001 were "overstated by including sales of cheese that never actually occurred." (¶¶ 89, 90, 92, 93, 101.) Accord Rombach v. Chang, 355 F.3d 164, 172 (2d Cir.2004) ("Plaintiffs assert that their Section 11 claims `do[ ] not sound in fraud' but the wording and imputations of the complaint are classically associated with fraud: that the Registration statement was `inaccurate and misleading;' that it contained `untrue statements of material facts;' and that `materially false and misleading written statements' were issued.").
Because the § 11 claim "sounds in fraud," the heightened pleading requirements must be satisfied. Lead Plaintiff argues that it satisfies the Rule 9(b) requirements for a section 11 claim as set forth in Rombach, 355 F.3d at 170. According to Rombach, Rule 9(b) requires that the Complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. Unfortunately for Plaintiffs, the Third Circuit applies a more demanding test for Rule 9(b). In the Third Circuit, Rule 9(b) requires that a plaintiff plead: (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his or her damage. Shapiro, 964 F.2d at 284; Castlerock Mngmt., 68 F.Supp.2d at 485.
A statement or omission is material if there is "a substantial likelihood that, under the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." Zucker v. Quasha, 891 F.Supp. at 1014 (citing Renz v. Shreiber, 832 F.Supp. 766, 775 (D.N.J.1993); TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). See also Donald J. Trump, 7 F.3d at 368 n. 10 (noting that materiality analysis for claims under §§ 10 and 10(b) of the Securities and Exchange Act of 1934 applies equally to claims under §§ 11 and 12 of the Securities Act of 1933). A fact is material if its disclosure would have "significantly altered the `total mix' of information available." Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628, 641 (3d Cir.1989).
In Count 1 of the Class Complaint, Lead Plaintiff identifies several statements that were allegedly fraudulent. (See ¶¶ 83-147.) The statements are alleged to have been made in the 2001 Registration Statement and Prospectus (See, e.g., ¶¶ 66, 68, 85-102.) and in the financial statements for the fiscal years 2000 and 2001 (See, e.g., ¶¶ 67, 103-140.) Explanations for why these statements were fraudulent were also included. (See ¶¶ 85-102, 108, 111, 119, 126, 129, 134-137, 139.) Ignorance of the falsity of these statements is alleged in ¶ 144 and damage is alleged in ¶ 147. The alleged fraudulent statements involve material facts because if investors knew that the transactions with customers such as Quattrone, Fransen or Vieira were fictitious and that cheese was adulterated, such facts would have been significant in the deliberations of the reasonable shareholder.
Suprema is identified as the "speaker" as well as those who signed the Registration Statement: Cocchiola, Venechanos and the director defendants (¶ 46), the underwriters and the auditor. Although the Class Complaint fails to specifically link such misstatements to the named defendants, once a misstatement is alleged section 11 liability attaches to these defendants by virtue of 15 U.S.C. § 77k(a)(1-5). Knowledge of falsity by the person who *651 made it and intention that it should be acted upon was not alleged in Count 1. In fact, Lead Plaintiff specifically states in ¶ 2 that their "Securities Act claims are not based on any knowing or reckless misconduct on the part of the defendants  i.e., they do not allege, and do not sound in fraud." Lead Plaintiff's Section 11 claim under the Securities Act fails against all defendants under this Rule 9(b) standard of Shapiro. At oral argument, Lead Plaintiff clarified that it was suing under a negligence theory as to the Underwriter Defendants and the individual Outside Director Defendants (Marco Cocchiola, Acosta, DeSocio and Rutcofsky) and under a fraud theory as to Mark Cocchiola, Venechanos and BDO and argued that the Rule 9(b) particularity requirements only applied to the latter group of defendants.[1] This Court is not persuaded by Lead Plaintiff's argument. In paragraph 1 of the Second Amended Complaint, Lead Plaintiff alleges "[t]his case arises out of the massive fraud that was perpetrated at Suprema, and the resulting demise of the Company...." This allegation is incorporated into Plaintiff's § 11 claim in Count 1. (CC ¶ 45.) In Count 1, Lead Plaintiff also refers to, inter alia, the cheese sale "transactions that never actually took place," "overstated aggregated sales," overstated inventory, mislabeled and adulterated cheese inventory, and the "failure to disclose the truth about the nature of Suprema's business and the associated risks." (CC ¶¶ 51, 87, 89, 102, 123, 124, 129.) Lead Plaintiff's boilerplate language in paragraph 2 stating that the section 11 claim in Count 1 is based in negligence and "do[es] not sound in fraud" is insufficient to limit the claim to negligence where "the wording and imputations of the complaint are classically associated with fraud." See Rombach, 355 F.3d at 172.
SSF Complaint
The SSF Complaint expressly disclaims any allegations that could be construed as alleging fraud which further supports the limitation of their § 11 claim to negligence. (SSF ¶ 277.) See In re AnnTaylor Stores Sec. Litig., 807 F.Supp. 990, 1003 (S.D.N.Y.1992) ("Since plaintiffs disavow any claim of fraud or mismanagement in Count I, it need not comply with Rule 9(b)."); see also Westinghouse, 90 F.3d at 717 n. 21 (noting that in their brief, "plaintiffs expressly disavowed any reliance on the allegations supporting the fraud claims in an effort to avoid having Rule 9(b) apply to [their Section 11 claims]"). But such disclaimers are not always sufficient. See In re Stac Elec. Secs. Litig., 89 F.3d 1399, 1404 n. 2 (9th Cir.1996) (plaintiff's argument that it "specifically disclaimed any allegations of fraud with respect to its section 11 claims" was "unconvincing where the gravamen of the complaint is plainly fraud"), cert. denied, 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). "[T]he court is not required to put on a *652 blindfold when ruling on a motion to dismiss." Castlerock Mgmt., 68 F.Supp.2d at 487 (applying Rule 9(b)).
In its section 11 claim, the SSF Plaintiffs identify several specific false representations of material fact and explain why they are material. (See ¶¶ 190-220.) These facts are material because such facts would have significantly altered the total mix of information available to a reasonable investor. They were allegedly made in the 2000 and 2001 Registration Statements. (¶ 187.) In ¶¶ 223-224, SSF Plaintiffs allege that they acted upon the false information to its damage and, in ¶ 226, that plaintiffs were ignorant of the falsity of the statements.
The SSF Complaint also sounds in fraud despite the disclaimer in paragraph 185 because the misstatements or omissions are based on the alleged fraudulent activity of Suprema and at least one of its employees and some of its purported customers and suppliers. Thus, Rule 9(b)'s more stringent pleading requirements apply. Plaintiffs failed to allege knowledge of the falsity by the person who made it and intention that it be relied upon. SSF Plaintiffs do make these allegations in the general facts section of the Complaint (See, e.g., ¶¶ 52, 54, 60, 105, 114), however, they "expressly disclaim and exclude any allegation that could be construed as alleging fraud or intentional or reckless misconduct" in ¶ 185. Under the Shapiro Rule 9(b) standard, SSF Plaintiffs' section 11 claim fails along with that of Lead Plaintiff.
B. Section 12
Class Complaint
In Count 2 of the Class Complaint, Lead Plaintiff alleges that the defendants "offered and sold Suprema common stock to the class in the Secondary Offering by means of the prospectus." (¶¶ 148, 151.) This satisfies the first and third elements of a § 12 Securities Act claim. Paragraph 5 of the Complaint asserts the use of "the means and instrumentalities of interstate commerce including the United States mail" which satisfies the second element. The class alleges a material misstatement or omission in ¶ 152, referencing ¶¶ 85-102. In paragraph 153, Lead Plaintiff alleges that it did not know of the untruth or omission. And, in paragraph 154, Lead Plaintiff alleges that the underwriter and officer defendants failed to make a reasonable investigation nor possessed reasonable grounds for the belief that the statement contained in the Prospectus were accurate or complete in all respects.[2] Lead Plaintiff appears to have adequately plead a Section 12 Securities Act claim. However, as in Count 1, Lead Plaintiff fails to plead knowledge of falsity by the person who made it and intention that it should be acted upon which is required by Rule 9(b). See Shapiro, 964 F.2d at 288. In fact, Lead Plaintiff specifically states in ¶ 2 that their "Securities Act claims are not based on any knowing or reckless misconduct on the part of the defendants  i.e., they do not allege, and do not sound in fraud." Saying it does not make it so. Lead Plaintiff's Section 12 claims against the Officer and Underwriter Defendants are dismissed.
SSF Complaint
Similarly, in Count 2 of the SSF complaint, Plaintiffs allege the sale or offer of securities (¶¶ 235, 236), by the use of *653 communications in interstate commerce (¶ 235), through a prospectus (¶ 235), by making a false statement of material fact or omitting a fact necessary to make the statements not misleading (¶ 239), plaintiffs did not know of the untruth or omission (¶ 240). They state that defendants could have known of the material misstatements and omissions alleged had they conducted a reasonable investigation. (¶ 241.) But again SSF Plaintiffs' section 12 claim fails because the Complaint fails to allege knowledge of the falsity by the person who made the misstatement and intention that it be relied upon. See Shapiro, 964 F.2d at 288. SSF Plaintiffs do make these allegations (see, e.g., ¶¶ 52, 54, 60, 105, 114), however, they "expressly disclaim and exclude any allegation that could be construed as alleging fraud or intentional or reckless misconduct" in ¶ 234. The SSF Plaintiffs' section 12 claims against the Officer and Underwriter Defendants are dismissed.
III. Exchange Act
Section 10(b) and Rule 10b-5
Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), prohibits the use of fraudulent schemes or devices in connection with the purchase or sale of securities. Under § 10(b), it is unlawful to "employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention" of any rule promulgated by the SEC designed to protect the investing public. 15 U.S.C. § 78j(b). To implement the statute, the SEC enacted Rule 10b-5, violation of which gives rise to a private cause of action. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). That Rule makes it unlawful: (1) "to employ any device, scheme, or artifice to defraud," (2) "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," or (3) "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. The Supreme Court has held that standing to bring a private cause of action under Rule 10b-5 is limited to actual purchasers or sellers of securities. Blue Chip Stamps, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539.
To make a 10b-5 claim, a plaintiff must allege that the defendant made: (1) a misstatement or omission (2) of a material fact (3) with scienter (4) in connection with the purchase or sale of a security (5) upon which plaintiff reasonably relied and (6) that reliance proximately caused the injury to the plaintiff. Kline v. First Western Gov't Sec., Inc., 24 F.3d 480, 487 (3d Cir.1994), cert denied sub nom., Arvey, Hodes, Costello & Burman v. Kline, 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1244 (3d Cir.1989). Claims asserted under Rule 10b-5 are subject to the enhanced pleading requirements of Rule 9(b). The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), specifically addressed the scienter requirement of a § 10(b) claim. It requires that a complaint which asserts a § 10(b) claim must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see In re NAHC, Inc. Secs. Litigation, 306 F.3d at 1328, Nappier v. Pricewaterhouse Coopers LLP, 227 F.Supp.2d 263, 273 (D.N.J.2002) (emphasizing *654 the word "strong"); P. Schoenfeld Asset Management LLC v. Cendant Corp., 142 F Supp 2d 589, 604 (D.N.J.2001); June 25, 2003 Opinion. "Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." In re Rockefeller Center Properties, Inc. Secs. Litig., 311 F.3d 198, 216 (3d Cir.2002) (emphasis deleted); Advanta, 180 F.3d at 533.
Scienter is a culpable state of mind. As the Supreme Court observed in Ernst & Ernst, 425 U.S. at 193 n. 12, 96 S.Ct. 1375, "`[S]cienter refers to a mental state embracing intent to deceive, manipulate, or defraud.'" To satisfy this pleading requirement, plaintiffs must state with particularity facts which show that defendants had both motive and opportunity to commit fraud or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Id. Recklessness, in turn, involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. Conscious behavior in this sense refers to "intentional fraud or other deliberate illegal behavior." Id.
Recklessness suffices where there exists "a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception." McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir.1979) (internal quotations omitted); see June 25, 2003 Opinion at 34. See also Nappier, 227 F.Supp.2d at 275 ("must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company") (internal quotation omitted); P. Schoenfeld, 142 F.Supp.2d at 607.
Section 18
As noted in the June 25, 2003 Opinion, section 18 grants a right of action to any person who purchases or sells a security in reliance on a false or misleading statement of a material fact included in any application, report or document filed with the SEC pursuant to the Exchange Act. 15 U.S.C. § 78r(a).[3] Proof of scienter is not needed, but allegations of actual (as opposed to presumed) reliance are required to state a § 18 claim. 15 U.S.C. § 78r; Heit v. Weitzen, 402 F.2d 909, 916 (2d Cir.1968), cert. denied 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969); Ross v. A.H. Robins Co., 607 F.2d 545, 552. Constructive reliance is not sufficient. Heit v. Weitzen, 402 F.2d at 916. A plaintiff must specifically allege that he actually read a copy of the document filed with the SEC, or relevant parts of the document reported in some other source, and was induced to act upon specific misrepresentations in the document. In re American Continental Corp./Lincoln Sav. & Loan Sec. Litig., 794 F.Supp. 1424, 1438 (D.Ariz.1992); Jacobson v. Peat, Marwick, Mitchell & Co., 445 F.Supp. 518, 525 (S.D.N.Y.1977); Lindner *655 Dividend Fund, Inc. v. Ernst & Young, 880 F.Supp. 49, 56 (D.Mass.1995).
A. Section 10(b) and Rule 10b-5
Misstatement or Omission of a Material Fact
As discussed, Plaintiffs identify misstatements or omissions of material facts which are attributed to the Defendants Cocchiola and Venechanos by virtue of their signatures on the Registration Statements and other Exchange Act documents filed with the SEC (CC ¶¶ 271, 283, 287; SSF ¶ 330) and to BDO for authorizing the use of such statements in financial statements audited by BDO. (CC ¶¶ 281, 282, 304; SSF ¶¶ 398, 399.) SSF Plaintiffs attribute the misstatements to the Director and Underwriter Defendants by virtue of their signatures on the Registration Statements.
Scienter
Cocchiola and Venechanos
One's position in company is not enough to show knowledge or recklessness. See Advanta, 180 F.3d at 539; In re Cendant Corp. Sec. Litig., 76 F.Supp.2d 539, 547; June 25, 2003 Opinion at 32, 38. "Absent specific factual allegations linking specific defendants with the preparation of ... allegedly false financial statements ..., defendants cannot be said to have necessarily participated in such activities simply because they were in positions of authority." In re Tyco Int'l, Ltd. Sec. Litig., 185 F.Supp.2d 102, 115 (D.N.H.2002).
Plaintiffs rely on In re Campbell Soup Co. Sec. Litig., 145 F.Supp.2d 574, 599 (D.N.J.2001), for the proposition that when the fraud involves the Company's core business, "the Company's CEO and CFO ... are presumed to have had pertinent knowledge." Thus, Plaintiffs conclude that they have sufficiently plead facts giving rise to a strong inference of scienter. But, as Defendant Cocchiola points out, the Campbell Soup plaintiffs set forth "a detailed picture of the improper practices in which Defendants knowingly engaged" in their complaint. The Campbell court also noted that "[m]ore importantly [than the presumed knowledge that the CEO and CFO had], Plaintiffs identify specific circumstances under which Defendants [CEO and CFO] had access to and received information about the sales efforts and the related accounting practices." Id.[4]
Here Plaintiffs have not alleged such "specific circumstances" where Cocchiola and Venechanos had "access to and received information about" the fraudulent transactions. Rather, Plaintiffs ask the Court to infer scienter from, inter alia, Cocchiola and Venechanos' positions as CEO and CFO, admissions of former Suprema employees, suppliers and customers in criminal Informations including that the criminal actions were known and authorized by "Suprema management," "senior *656 management," defendants' signing of hundreds of thousands of dollars in checks to entities who admitted that they did not provide goods or services to Suprema, ship to addresses on Suprema's invoices, the adulteration of cheese as admitted by Van Sickell, and that Suprema's controller, Art Christiansen, resigned his position because he was unwilling to participate in the tasks assigned to him. (CC ¶¶ 313(i)(d), 170-171, 196-221, 202, 212, 218, 233, 235, 244.; SSF ¶ 341.) Cocchiola and Venechanos are not specifically named in the criminal Informations, nor were they named in the SEC enforcement action against 10 individuals for their participation in the fraud. That "senior management" was identified in the criminal Informations as involved in or authorizing the fraud by those who plead guilty does not, without more, raise a strong inference of scienter as to Cocchiola and Venechanos.[5] (See, e.g., CC ¶¶ 175-245; SSF ¶¶ 110, 114.)
Plaintiffs' motive and opportunity scienter allegations include Cocchiola's stock sales, timing and volume, and position as Director and Chief Executive Officer which this Court previously found to be insufficient. June 25, 2003 Opinion at 37, 39. (CC ¶¶ 314(i), 315; SSF ¶¶ 23, 352-345(sic), 371-373.) Plaintiffs ask the Court to make similar scienter inferences against Venechanos on the basis of stock activity, his position as CFO of Suprema, and responsibilities attendant thereto, the Christianson resignation letter and Venechanos' alleged invocation of his Fifth Amendment right at a bankruptcy proceeding, and references to "Suprema's management" in the criminal Informations of the four individuals who plead guilty for participating *657 in the Suprema fraud. (CC ¶¶ 314(ii), 315; SSF ¶¶ 24, 371-373.) The Third Circuit has made it clear that insider stock sales can only raise an inference of fraud where they are "unusual," and a plaintiff bears the burden of pleading a factual basis to demonstrate that they were unusual or suspicious. See, e.g., Oran v. Stafford, 226 F.3d 275, 290 (3d Cir.2000) ("While we will not infer fraudulent intent from the mere fact that some officers sold stock, `if the stock sales were unusual in scope or timing, they may support an inference of scienter.'"); Advanta, 180 F.3d at 540; Burlington Coat Factory, 114 F.3d at 1423; Wilson v. Bernstock, 195 F.Supp.2d 619, 634-35 (D.N.J.2002). See also June 25, 2003 Opinion at 37-38.
This Court previously rejected the allegations regarding the stock sales of both Cocchiola and Venechanos because Plaintiffs failed to plead that the sales were unusual in timing and scope. Here Plaintiffs allege that the timing of Cocchiola's stock sales is unusual and suspicious because before the class period, Cocchiola only sold 50,000 shares but then weeks before NASDAQ suspended trading, Cocchiola sold 347,809 (31%) in a secondary stock offering and pledged 200,000 (20%). Venechanos sold no stock before the secondary offering in which he sold 52, 937 shares (38%). This Court finds that the pleadings still do not sufficiently allege that the stock sales were unusual for the same reasons expressed in the June 25, 2003 Opinion. Both Cocchiola and Venechanos sold their respective shares as part of the Secondary Offering, a natural time for such sales. The sales were fully disclosed as part of the Secondary Offering. Even with the 20% stock pledge by Cocchiola, both Cocchiola and Venechanos retained large stock holdings after the sales, 49% and 62%, respectively. See Advanta, 180 F.3d at 540-541 (where defendant kept a sizeable percentage of Advanta's outstanding stock even after his sales, "[f]ar from supporting a `strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, these facts suggest that they had every incentive to keep Advanta profitable.").
BDO
Both Lead Plaintiff and the SSF Plaintiffs focus on circumstantial evidence of BDO's reckless or conscious behavior to show BDO's scienter. The thrust of the Complaints against BDO is that it had issued a "clean" audit opinion which ultimately proved to be erroneous, that there were audit steps that BDO might have taken but did not, and there were numerous "red flags" that BDO did not investigate.
In securities fraud claims against an auditor  claims which generally are based on the fraud of others  "the failure... to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." Nappier, 227 F.Supp.2d at 275 (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir.2000)). Rather, plaintiffs must allege that the auditor's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care [and] must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." Id. (quoting Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir.2000)). Moreover, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.... [O]nly where such allegations are coupled with evidence of corresponding fraudulent intent, might they suffice." Id. at 276, (quoting Novak, 216 F.3d at 309). Similarly, allegations that an auditor "must have known," by virtue of its role as auditor, of *658 the defendant company's role is insufficient by themselves to permit an inference of recklessness. See id. at 276-77 (citing Rothman, 220 F.3d at 98).
As the Third Circuit explained in McLean:
A showing of shoddy accounting practices amounting to at best a "pretended audit" or of grounds supporting a representation "so flimsy as to lead to the conclusion that there was no genuine belief back of it" have traditionally supported a finding of liability in the face of repeated assertions of good faith, and continue to do so. In such cases, the fact finder may justifiably conclude that despite those assertions the "danger of misleading... [was] so obvious that the actor must have been aware of it."
599 F.2d at 1198 (citations and quotations omitted). See also In re Worldcom, Inc. Sec. Litig., No. 02 Civ. 3288, 2003 WL 21488087 (June 25, 2003) ("[t]he allegations identifying the steps Andersen should have taken and failed to take, and the fraud it would have discovered if it had taken those steps, create a strong inference the Andersen acted recklessly in conducting the WorldCom audits."). See also In re First Merchants Acceptance Corp. Sec. Litig., No. 97 CV 2715, 1998 WL 781118 at *11, 1998 U.S. Dist. Lexis 17760 at *32, 33 (N.D.Ill. Nov. 2, 1998) (Court denied the accountant's motion to dismiss, finding that "the magnitude of the misstatements, the specific GAAP and GAAS violations and the `red flags' together support an inference that Deloitte's audit amounted to no audit at all or an egregious refusal to see the obvious or investigate the doubtful.") (quotations omitted).
"The issue is whether the defendants had an honest belief that the statements made by them were true. If they did have that honest belief, whether reasonably or unreasonably, they are not liable." McLean, 599 F.2d at 1198. This information is tested against the knowledge that the auditor had, not what it would have had if the audit were conducted differently. See McLean, 599 F.2d at 1199. If the magnitude of the fraud "either enhanced the suspiciousness of specifically identified transactions, or made the overall fraud glaringly conspicuous," P. Schoenfeld, 142 F.Supp.2d at 609, then an auditor may have "reckless[ly] disregard[ed] of numerous  even hundreds  of unsupported entries." "Where a transaction derives its suspiciousness from specific details associated with the audited company's business, the plaintiff must plead facts suggesting the accountant's awareness of those details." Nappier, 227 F.Supp.2d at 276.
The complaints claim that the audit was erroneous because Suprema's sales were overstated; it overstated the accounts receivable; that, accordingly, its reserves against receivables proved too low; and that the value of its inventory was too high. Plaintiffs' theory is because the alleged fraud was so massive, BDO must have known or should have known of it when it performed its audits and therefore acted recklessly in certifying Suprema's financial statements. Even if some courts have accepted the "must have known" reasoning rejected by the Nappier court, most if not all of those cases advanced by the plaintiffs involved an acknowledgment of misstated financial statements. See, e.g., P. Schoenfeld, 142 F.Supp.2d at 610. Here, there has been no restatement of Suprema's financial statements or other acknowledgment that the financial results were misstated. The absence of such acknowledgment undermines plaintiffs' attempt to infer knowledge based on the magnitude of the alleged fraud.
Plaintiffs argue that had BDO conducted a bona fide investigation of the very *659 limited number of suppliers and customers that constituted the vast majority of Suprema's reported business; corroborated the representations of management through a review of Suprema's books and records; conducted interviews with those employees responsible for the Company's internal accounting, and interviews of Suprema's major customers and suppliers; or investigated the possibility of related party transactions and the sources of financial resources supporting the Company's transactions, accounts receivable and the like BDO would have discovered the fraud. According to Plaintiffs, BDO's failure to take these steps  which were required by GAAS  was severely reckless.
BDO argues that an auditor does not guarantee the correctness of its opinion and that an auditor is not required to take every possible auditing step. But that the auditor must have a reasonable basis for its opinion. BDO also claims that it was the victim of Suprema's fraud because Suprema's employees and individuals outside the audited company made misstatements and sent false communications to BDO. BDO notes that Suprema did manufacture and ship some hard cheese. The supporting documentation, including invoices and bills of lading that looked genuine, and fund transfers by check and otherwise, was created to reflect sales that proved to be inflated. To all appearances, the sales had occurred and payment was forthcoming. BDO confirmed the receivable balances with those purportedly owing the money and the false explanation given for the growth of such balances was they had extended credit terms. The level of reserves against receivables set up by management is a matter of professional judgment. See Shapiro, 964 F.2d at 281. BDO also asserts that the adulterated inventory was worth far less than superior grade cheese would be but that it was not an expert in cheese and the labels were changed to mask the adulteration so short of performing laboratory tests for quality it did all it was required to do.
Finally, BDO contends that the red flags "must be closer to smoking guns than mere warning signs." BDO Br. at 16 (citing Nappier, 227 F.Supp.2d at 278). Even with the admissions of guilt by Van Sickell, Quattrone, Fransen and Vieira and the criminal Informations detailing the fraud, the complaints do not show that BDO knew: the sales were fictitious, that there was a relationship among or greater concentration of buyers and sellers of hard cheese than was reported, that shipments were fictitious, or that various warehouses and facilities of Suprema were not as expected. The purported `red flags' were normal aspects of a healthy business: the fact that management played an important role in the business and had stock in the company and were paid bonuses based on performance, cash flow problems due to extended payment terms for the largest purchasers, faster growth than other companies in the cheese industry.
Unlike the accounting firms in Cendant and P. Schoenfeld, here the accounting firm was in effect a victim of the fraud. Not only were all those involved in the hard cheese business at Suprema part of the fraudulent scheme, according to the complaints at issue, but a substantial number of persons and entities outside Suprema were also involved in the scheme. An object of all of the conspirators was to deceive, among others, Fleet and Sovereign Banks (Suprema's lenders), the Securities and Exchange Commission, and the investing public, and the auditors. The criminal Informations cited in the complaints explicitly state that Suprema's employees made misstatements and sent false confirmations to BDO to effectuate their fraudulent scheme. See, e.g., Information in United States v. Van Sickell, Docket No. *660 CR 04-12, ¶ 43 (D.N.J.2004). What under different circumstances may be an indicator of fraudulent intent  the magnitude of the fraud, violations of GAAP, and the presence of "red flags"  do not rise to a "strong inference" of recklessness here. Rather, given the information available to BDO at the time of the audit it can not be said that BDO did not have an honest belief that the statements made by it were true.
Outside Director Defendants (the Audit Committee)
In its scienter allegations, the SSF Complaint merely states that the outside director defendants had the responsibility to review the company's financial reporting, external audits, internal controls and compliance. (¶ 378.) The Complaint then states that the audit committee "had access to" business records, BDO and BDO's audit procedures, Suprema's personnel, all phases of Suprema's manufacturing business operations. (¶ 380-383.) According to the SSF Complaint, "[t]he fact that Suprema recognized significant and material amounts of revenue in violation of the Company's own internal revenue recognition policies  the very policies that these defendants were responsible for monitoring  supports a strong inference of recklessness." (¶ 384.) But the SSF Plaintiffs did not specifically state in this count that the outside directors failed to carry out their monitoring duties. "Plaintiffs may not impute knowledge of a company's financial infirmities to defendants solely by nature of the positions they held." In re Milestone Scientific Sec. Litig., 103 F.Supp.2d 425, 470 (D.N.J.2000). Here the Complaint merely concludes that the outside director defendants were reckless without providing specific facts from which the Court can infer motive, opportunity, or recklessness. Such is legally defective.
Underwriter Defendants
The SSF Complaint alleges that the Underwriter Defendants had statutory obligations to conduct due diligence and that they abdicated such obligations. (SSF ¶¶ 385-390.) Specifically, the complaint avers that they failed to adequately review Suprema's internal financial forecasts, contracts and other documents; failed to make a physical inspection of the major facilities; failed to employ analysts with expertise in the cheese business; failed to interview senior and middle management and major customers. (¶ 389.) Had they done so, the complaint avers, they would have discovered the fraud. (¶ 388.) The complaint offers no allegations of motive or opportunity except that they earned "significant fees" for their services. (¶ 385.) Allegations that proper due diligence would have uncovered the "truth ... constitute negligence at best, and these types of allegations against an underwriter have always been insufficient to establish scienter under the federal securities laws." In re WRT Energy Sec. Litig., 1999 WL 178749, *10 (S.D.N.Y. March 31, 1999); Advanta, 180 F.3d at 525 (negligence is insufficient for scienter).
B. Section 18
The parties disagree whether the heightened pleading requirements of Rule 9(b) apply to a Section 18 claim. This issue need not be determined at this time because the claim fails on the "actual reliance" prong. Here the SSF Plaintiffs identify misrepresentations in documents filed with the SEC under the Exchange Act. Paragraphs 279, 283, 296, 300, and 320 refer to Suprema's 10Q and 10K documents which were Exchange Act documents filed with the SEC between May 2000 and November 2001 and signed by the Officer Defendants or audited by BDO (See, e.g., SSF ¶¶ 293, 294, 317, 318.) The *661 SSF Plaintiffs identify the misrepresentations and explain why they were misleading. (See, e.g., SSF ¶¶ 280, 281, 283-294.) SSF Plaintiffs go on to state for each document that they "received, reviewed, actually read, and relied upon Suprema's [Exchange Act filing]. Plaintiff obtained this document at or about the time it was publicly filed with the SEC, and actually read and relied upon it in making their decisions to invest in Suprema common stock...." (SSF ¶¶ 282, 295, 299, 319, 321.) The Lindner court noted that the plaintiffs in that case alleged that they "`specifically relied upon the various statements contained in said reports'" and ruled that plaintiffs satisfied their burden of alleging that "they saw and relied upon the alleged misstatements contained in the documents." Lindner, 880 F.Supp. at 56. Here the SSF Plaintiffs identify the fraudulent or misleading statements but merely allege that they relied the on documents that contained misstatements. They did not allege actual reliance on the specific misrepresentations themselves. Plaintiff's section 18 claim is dismissed as to all defendants.
IV. Section 15 of the Securities Act and Section 20 of the Exchange Act
The elements of controlling persons claims under Section 20 of the Exchange Act and Section 15 of the Securities Act are identical. See In re MobileMedia Sec. Litig., 28 F.Supp.2d at 940. To state a claim for control person liability, the plaintiff must allege (1) a primary violation of the federal securities laws by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful way a culpable participant in the primary violation. Tracinda Corp. v. DaimlerChrysler AG, 197 F.Supp.2d 42, 55 (D.Del.2002). Section 15 of the Securities Act provides liability for "controlling persons" for violations of §§ 11 and 12. Under § 15:
Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency or otherwise, controls any person liable under sections 77k or 77l (a)(2) of this title [that is, §§ 11 and 12] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
15 U.S.C. § 77o. "Controlling person liability exists where the defendant has direct or indirect power over the management or policies of a person...." In re Cendant, 60 F.Supp.2d at 367 (quoting Wiley v. Hughes Capital Corp., 746 F.Supp. 1264, 1281 (D.N.J.1990)) (citation omitted). In the determination of whether a person is a "controlling person" within the meaning of § 15, "heavy consideration" should be given "to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof." In re Cendant, 60 F.Supp.2d at 367 (quoting Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 890-91 (3d Cir.1975)).
Section 20(a) of the Exchange Act creates liability for "controlling persons" in a corporation, and imposes joint and several liability upon anyone who "controls a person liable under any provision of" the Exchange Act. 15 U.S.C. § 78t(a). To maintain a claim under § 20(a), the plaintiffs must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons. *662 Campbell Soup, 145 F.Supp.2d at 599. But see Cendant, 60 F.Supp.2d at 379 (citing Rochez Bros., 527 F.2d at 885) (holding that plaintiff must also allege that control persons are "in some meaningful sense culpable participants in the fraud perpetuated by controlled persons.").
Here where the underlying securities violations are inadequately plead against Defendants Cocchiola and Venechanos, the §§ 15 and 20 control person claims fail on the first element. Because both Lead Plaintiff and the SSF Plaintiffs failed to state a claim under section 11 or 12 of the Securities Act, and section 10(b) of the Exchange Act, their sections 15 and 20 claims fail also.
V. SSF Common Law: Fraud and Negligent Misrepresentation
The SSF Plaintiffs assert claims against all defendants for common law fraud and fraudulent misrepresentation, and negligent misrepresentation. The basis for this Court's subject matter jurisdiction over these claims appears to be supplemental jurisdiction to the Court's original jurisdiction over the federal securities law claims. Because the federal claims have been dismissed, the Court, in its discretion, will not maintain jurisdiction over the state law claims. They too are dismissed, under 28 U.S.C. § 1367(c)(3).

CONCLUSION
Defendants' motions are granted and both the Second Amended Class Action Complaint and the Second Amended SSF Complaint are dismissed.

ORDER
Defendants having moved to dismiss the Second Amended Complaints of lead plaintiff Teachers' Retirement System of Louisiana ("Lead Plaintiff") in civil action number 02-168 and of plaintiffs Special Situations Fund III, L.P. and Special Situations Cayman Fund LLP (the "SSF Plaintiffs") in civil action number 02-3099, and the Court having considered the submissions of the parties and heard the arguments of counsel,
IT IS on this 26th date of August, 2004,
ORDERED that Defendants' respective motions are GRANTED and both complaints are DISMISSED.
NOTES
[1] Plaintiffs argue that even though they incorporate all the factual averments, they are permitted to argue negligence in the alternative and because their negligence claims are plead before the fraud claims they are not required to plead with particularity under Rule 9(b). See In re CINAR Corp. Secs. Litig., 186 F.Supp.2d 279, 308 (E.D.N.Y.2002) ("A Section 11 claim does not sound in fraud simply because it is based on acts that also support a claim for securities fraud under Section 10(b)."); In re Cendant Corp. Litig., 60 F.Supp.2d at 364 ("[T]his complaint does not incorporate allegations of scienter and fraud into the § 11 claim. Rather, here the § 11 claim is plead before any of the other claims. Although the plaintiffs have plead that certain defendants acted fraudulently in violation of § 10(b), the § 11 claim is limited to negligence."); Resolution Trust Corp. v. del Re Castellett, 1993 WL 719764, *2 (D.N.J.1993) ("At the outset the Court notes that Rule 9(b) does not reach claims grounded in negligence.... While the events underlying both counts are exact, plaintiff is entitled to proceed on alternate grounds of liability.").
[2] Lead Plaintiff asserts that the officer defendants participated in the drafting of the prospectus which is a stronger basis for the argument that this claim "sounds in fraud" and is subject to the particularity requirements of Rule 9(b). (¶¶ 150, 151.)
[3] 15 U.S.C. § 78r(a) provides, in relevant part:

Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder ..., which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading.
[4] The Campbell Soup court relied on the following specific allegations: "In this case, Plaintiffs have specifically alleged that Defendants Morrison and Anderson were involved in discussions regarding the Company's sales and shipping practices and that, in these discussions, reservations were expressed about the propriety of these practices. On one occasion, Plaintiffs claim, Defendant Morrison rejected recommendations that the practices stop. On another occasion, he allegedly said that he did not want the `L' word _ `loading' _used because it was hurting morale. Plaintiffs also allege that Defendant Morrison gave William Toler revenue targets, which then guided the levels of `loading' that occurred. Defendant Morrison allegedly also received memoranda regarding the status of the Company's sales efforts. Plaintiffs further claim that both Defendant Morrison and Defendant Anderson were involved in preparing the statements that the Company released to the public and filed with the SEC." Campbell Soup, 145 F.Supp.2d at 599.
[5] Plaintiffs also argue that Cocchiola and Venechanos asserted their Fifth Amendment right and refused to answer any questions relating to Suprema's business or their dealings with the individuals and entities identified in the Second Amended Complaint, thereby raising a negative inference in favor of Lead Plaintiff. (CC ¶¶ 313(i)(k), (ii)(j); SSF ¶¶ 119, 120.) As recently noted by the First Circuit, "in a civil proceeding, the drawing of a negative inference is a permissible, but not an ineluctable, concomitant of a party's invocation of the Fifth Amendment. While the law does not forbid adverse inferences against civil litigants, it does not mandate such inferences." In re Carp, 340 F.3d 15, 23 (1st Cir.2003) (internal citations omitted). Moreover, despite the permissibility of a negative inference, an analysis of all proffered evidence is required and "[s]ilence is a relevant factor to be considered in light of the proffered evidence, but the direct inference of guilt from silence is forbidden" and therefore exceeds constitutional bounds. LaSalle Bank Lake View v. Seguban, 54 F.3d 387, 390, 391 (7th Cir.1995). See also In re Bartlett, 154 B.R. 827, 829-30 (Bankr.D.N.H.1993).

Lead Plaintiff argues that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them, at least where refusal to waive the privilege does not lead automatically and without more to [the] imposition of sanctions." Mitchell v. U.S., 526 U.S. 314, 328, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (internal quotations and citations omitted); see also In re Grand Jury, 286 F.3d 153, 160 (3rd Cir.2002) ("We have held that reliance on the Fifth Amendment in civil cases may give rise to an adverse inference against the party claiming its benefits."). Drawing a negative inference in this case could unduly penalize Cocchiola and Venechanos for his invocation of the Fifth Amendment, particularly considering that the Fifth Amendment was invoked in the bankruptcy proceeding and not in this case. See SEC v. Greystone Nash, Inc., 25 F.3d 187, 192 (3d Cir.1994) ("A trial court must carefully balance the interests of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment. Because the privilege is constitutionally based, the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side"). No party cites authority for the use of a party's invocation of the Fifth Amendment to create a negative inference when such privilege was invoked in an unrelated case.